**Robert Daniel GASSLER, Jr., petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A09–1534.**

Supreme Court of Minnesota.

Sept. 2, 2010.

David W. Merchant, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, Wm. F. Klumpp, Jr., Assistant Attorney General, St. Paul, MN; and Charles Rasmussen, Todd County Attorney, Long Prairie, MN, for respondent.

Julie Ann Jonas, St. Paul, MN, for amicus curiae The Innocence Project of Minnesota.

## OPINION

PAGE, Justice.

In 1992, appellant, Robert Daniel Gassler, Jr., was found guilty of first-degree murder in Todd County District Court for his involvement in the shooting death of Dale Yungk and sentenced to life in prison. Along with other evidence, the State presented the testimony of a Federal Bureau of Investigation (FBI) agent who, relying on Composite Bullet Lead Analysis (CBLA),[1] testified that a pellet recovered from Yungk's body came from a box of ammunition tied to Gassler. Gassler's conviction was affirmed on September 3, 1993, and consequently became final on December 2, 1993.[2] *See State v. Gassler*, 505 N.W.2d 62 (Minn.1993). In 1997, a postconviction court denied, without an evidentiary hearing, Gassler's pro se petition for postconviction relief, and in 1999 we affirmed the postconviction court. *Gassler v. State*, 590 N.W.2d 769 (Minn.1999).

In 2005, the legislature amended the postconviction statute, Minn. Stat § 590.01 (2004), to provide, "No petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal." Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1097–98. With regard to the effective date of the amendment, the legislature provided, "Any person whose conviction became final before August 1, 2005, shall have two years after the effective date of this act [August 1, 2005] to file a petition for postconviction relief." *Id.* The legislature also created five exceptions to the two-year statute of limitations for filing a petition for postconviction relief. The second exception applies to allegations of newly discovered evidence that could not have been ascertained by the exercise of due diligence, that is not cumulative, that is not for impeachment, and that establishes by clear and convincing evidence that the petitioner is innocent. Minn.Stat. § 590.01, subd. 4(b)(2) (2008). The fifth exception applies when "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." Minn.Stat. § 590.01, subd. 4(b)(5) (2008).

In November 2007, Gassler saw a news report that indicated that CBLA evidence cannot establish the origin of bullets. On March 31, 2008, Gassler filed a second petition for postconviction relief arguing that he had been convicted on the basis of false evidence. Gassler invoked the newly discovered evidence and interests of justice exceptions to the two-year statute of limitations for filing a petition for postconviction relief. Gassler also filed a discovery motion, seeking to compel the State to

---

**1.** Composite Bullet Lead Analysis is also known as Comparative Bullet Lead Analysis.

**2.** The evidence underlying Gassler's conviction can be found in our opinion affirming his conviction on direct appeal and will be repeated in this opinion only as necessary to resolve the issues raised in this appeal.

obtain and disclose "FBI Laboratory principal and auxiliary examiner benchnotes" created during the CBLA testing.

The postconviction court denied Gassler's discovery motion, explaining that the State had no duty to disclose records that it did not possess. The postconviction court also summarily denied Gassler's second petition for postconviction relief. The postconviction court explained that Gassler's petition was barred by the two-year statute of limitations and no exception was applicable. Specifically, the postconviction court held that the newly discovered evidence exception did not apply because Gassler failed to prove his innocence by clear and convincing evidence. Concluding that Gassler's petition fell "squarely within the purview of the 'newly discovered evidence' exception," the postconviction court did not reach the issue of whether Gassler satisfied the requirements of the interests of justice exception. Gassler appealed.

At trial, the State presented evidence establishing the following facts. Dale Yungk was murdered early on the morning of April 14, 1990. His body was found on the side of a rural roadway in Todd County at around 7 a.m. Yungk was shot three times with a shotgun in the head and back and died from loss of blood.

The events leading to Yungk's death began in January 1990. On the night of January 14, 1990, police officers investigated a suspicious car outside a Roseville catering business, where it was later determined a burglary had been committed. Burglary tools, a sledgehammer, a large knife, and a .25 caliber semi-automatic pistol were found in the car, which was driven by Gassler with Yungk as the only passenger. Gassler was arrested at the time, but

ultimately neither he nor Yungk were charged with the burglary.

At the time of this incident, Yungk and Dale Lessard were living at the residence of Gordon Beckman, and Gassler lived there sporadically. In late January 1990, Yungk admitted to Lessard that he and Gassler had burglarized a business in Roseville. Also in late January 1990, Gassler was seen in Beckman's garage sawing off a shotgun and applying surgical tape to the stock. According to Lessard, Gassler intended to kill Yungk with the shotgun because he believed Yungk was a "snitch" and because Yungk had not given him his share of the money from the burglary.

On the night of April 13, 1990, a friend of Yungk's attempted to contact him at Beckman's residence. The friend telephoned at around 9 p.m., and Yungk told him to call back. When the friend called back, he was told that Yungk had left the residence with Gassler and James Scott.[3] The next morning, Yungk's body was discovered in Todd County. That same morning, Veronica Yarbough, a close friend of Gassler's, went to her mother's house and saw Gassler and Scott. Gassler told Yarbough that he and Scott had killed Yungk and left his body on the side of the road "to prove a point." Gassler offered Yarbough a spent shotgun shell as a "souvenir," but then changed his mind.

Ricky Foster testified that Scott and Gassler arrived at his home on April 14, and that Gassler had a sawed off shotgun that was wrapped in white surgical tape and smelled of gunpowder. Foster said that Gassler told him that he and Scott had committed some burglaries and that he had shot someone, although later Gassler claimed he was joking. Several days later, Scott and Gassler asked Foster's

---

**3.** James Scott was convicted of first-degree murder for his involvement in Yungk's murder in a separate trial held before Gassler's.

His conviction was affirmed in *State v. Scott,* 493 N.W.2d 546 (Minn.1992).

mother, Beverly Munoz, to keep a suitcase for them. She opened the suitcase and found a shotgun, ammunition, and other items. The next day Gassler said he wanted the shotgun back, but then refused to take the gun away. At the time, Gassler mentioned something about someone being murdered and that someone was trying to break into the house. Munoz ultimately turned the suitcase and its contents over to the St. Paul Police.

After obtaining the suitcase from the St. Paul Police, the Bureau of Criminal Apprehension (BCA), which was investigating Yungk's murder, determined that, in addition to the shotgun and ammunition, the contents included proceeds from burglaries. The BCA then asked Munoz to tape record several phone conversations with Gassler in connection with returning the shotgun to him. As a result of these conversations, Gassler was arrested by the St. Paul Police. When Gassler was interrogated by the BCA, he denied any involvement in Yungk's murder. However, he also indicated that he believed Yungk was a "snitch" and that he would tell the police nothing about Yungk's murder even if he knew who had done it.

In addition to presenting all of the evidence described above, the State also called two expert witnesses. The first expert testified that scratches on the shotgun shells indicated that they may have been fired from the shotgun recovered from Munoz, but the expert could not say so as to a scientific certainty. The second expert, FBI Special Agent John P. Riley, testified that he examined 10 pellets that were removed from Yungk's body and compared them against ammunition found in the suitcase recovered from Munoz. After noting that the same six elements were present in the pellets and the ammunition in the suitcase, Agent Riley testified that

the pellets were likely to have been manufactured by Federal Cartridge on or about the same date and likely came from the same box of ammunition.

To understand Agent Riley's testimony, one must first understand CBLA. Bullet lead originates as a large "pot" of molten lead refined from recycled automotive batteries. William A. Tobin,[4] *Comparative Bullet Lead Analysis: A Case Study in Flawed Forensics,* The Champion, July 2004, at 12, 13. The lead is then sent to a secondary refiner that uses the majority of the lead to make new batteries, but sends a small fraction (approximately five percent) of the recovered and refined lead to bullet manufacturers. *Id.* The lead is then cast into bullets and packaged in boxes stamped with packing codes (sometimes called "lot codes") and shipped to wholesalers. *Id.*

In the 1960s, the FBI began to offer CBLA as a forensic service. *Id.* at 14. CBLA is based on three assumptions: the tiny fragment of lead analyzed is a representative sample of the lead's origins; the source from which the fragment or sample originated is compositionally uniform; and no two molten sources are ever produced with the same composition. *Id.* at 16. Peer review of these assumptions was unavailable until the mid–1980s because access to a nuclear reactor was required for analysis. *Id.* However, because of advances in technology, the accuracy of predictions based on CBLA testimony can now be tested without a nuclear reactor. *Id.* CBLA expert witnesses have historically testified that when six or seven specific elements in the lead matrix match the bullet recovered by the police, the bullets must have a common source as to original pot of molten lead and, therefore, must have been produced by the same manufac-

---

**4.** William Tobin filed an affidavit in support of Gassler's motion to compel discovery.

turer on the same day. *Id.* at 13. Many times, as in this case, the witnesses have even concluded that the bullets came from the same box of bullets. *Id.*

In 2004, following a request from the FBI to investigate CBLA testing, the National Research Council (NRC) reported that CBLA data does not permit definitive statements concerning the origins of the bullets and that bullets originating from different sources can be indistinguishable. *Id.* at 12–13. In an effort to avoid the vague and ambiguous word "source" used by FBI Laboratory witnesses, the term "compositionally indistinguishable volume of lead" (CIVL) was defined by the NRC as the volume of lead that is "produced during one production run at one point in time." *Id.* at 20. The NRC report recommends that expert testimony be strictly limited to two possible conclusions: that bullets from the same CIVL are more likely to be analytically indistinguishable than bullets from different CIVLs and/or that having two bullets that are analytically indistinguishable increases the probability that two bullets came from the same CIVL versus no evidence of match status. *Id.* However, it is unknown how often unrelated CIVLs that are analytically indistinguishable are produced; therefore, it is impossible to say how likely matched bullets are to have a common origin. *Id.* Specifically, in its report, the NRC made a finding and recommendation that,

> [a]lthough it has been demonstrated that there are a large number of different [CIVLs], there is evidence that bullets from different CIVLs can sometimes coincidently be analytically indistinguishable. The possible existence of coincidentally indistinguishable CIVLs should be acknowledged in the laboratory report and by the expert witness on direct examination.

Nat'l Research Council, Forensic Analysis Weighing Bullet Lead Evidence 112 (2004).

In 2005, the FBI stated that it "still firmly support[ed] the scientific foundation of bullet lead analysis," but would cease the practice of using this type of evidence because of its relative probative value as compared to its cost. Press Release, Fed. Bureau of Investigation, FBI Laboratory Announces Discontinuation of Bullet Lead Examinations (Sept. 1, 2005), *available at* http://www.fbi.gov/pressrel/pressrel05/bullet_lead_analysis.htm. Following a report by CBS News and *The Washington Post*, the FBI issued a 2007 statement acknowledging that the "message[ ] on the discontinuation of bullet lead analysis [was] not clear enough and getting to the right people." Press Release, Fed. Bureau of Investigation, FBI Laboratory to Increase Outreach in Bullet Lead Cases (Nov. 17, 2007), *available at* http://www.fbi.gov/pressrel/pressrel07/bulletlead111707.htm. In the 2007 statement, the FBI indicated that the primary reason that CBLA was discontinued was "the inability of scientists and manufacturers to definitively evaluate the significance of an association between bullets made in the course of a bullet lead examination." *Id.* In January 2009, the FBI responded to a letter from the Minnesota Attorney General's office and stated that Agent Riley's testimony that the pellets removed from Yungk and the pellets tied to Gassler came from the same box was inappropriate and not supported by the science. The January 2009 letter also retracted an earlier May 2008 letter in which the FBI had indicated that Agent Riley's testimony was proper. The January 2009 letter explicitly stated that the agent could not opine that the pellet retrieved from the autopsy came from a particular box of ammunition or came from a particular source of lead.

Gassler conceded in the district court that his petition was filed after the July 31, 2007, deadline, but argued that the statute's newly discovered evidence and interests of justice exceptions to the time bar were applicable.[5] The postconviction court ruled that the newly discovered evidence exception did not apply because Gassler failed to prove by clear and convincing evidence that he is innocent. Further, concluding that Gassler's petition fell "squarely within the purview of the 'newly discovered evidence' exception," the postconviction court did not reach the issue of whether Gassler satisfied the requirements of the interests of justice exception. The postconviction court explained that having failed to satisfy the newly discovered evidence exception requirements, application of the interests of justice exception would "undermine the purpose and spirit" of the newly discovered evidence exception. The postconviction court further stated that "the Court does not believe any circumstances exist which would warrant a satisfaction of the time requirement in the interests of justice."

## I.

At the outset, it must be kept in mind that the only question before us is whether the newly discovered evidence or interests of justice exceptions found in Minn.Stat. § 590.01, subd. 4(b) (2008), permit Gassler's untimely postconviction petition to be heard. That is a separate· question from whether the substantive claims made in the petition itself entitle Gassler to relief on those claims. At this stage, we are concerned only with the former and not the latter.

We first address Gassler's claim that his petition for postconviction relief is not time barred because the statute's newly discovered evidence exception permits his petition to be heard. In order for the newly discovered evidence exception to apply: (1) a petitioner must allege the existence of newly discovered evidence (including scientific evidence); (2) the evidence could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition; (3) the evidence is not cumulative to evidence presented at trial; (4) the evidence is not for impeachment purposes; and (5) the evidence must establish by the clear and convincing standard that the petitioner is innocent of the offense for which the petitioner was convicted. Minn.Stat. § 590.01, subd. 4(b)(2). The postconviction court held that Gassler satisfied the first four prongs of this test, but failed to establish the final prong. In its brief, the State does not challenge the court's finding that the first three prongs of this test were met, so these issues will not be addressed.[6] *Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982) (concluding that issues not argued in briefs must be deemed waived on appeal); *Scruggs v. State,* 484 N.W.2d 21, 24 n. 1 (Minn.1992) ("Appellant's brief does not address the first three claims, so these claims are deemed waived.").

The fifth prong of the test, which in this case is dispositive,[7] requires that the

---

5. There is no dispute that Gassler's second postconviction petition was filed within two years of his learning of the statements made in the FBI's November 2007 press release.

6. We do not believe that the CBLA evidence constitutes newly discovered evidence, rather, it is more properly characterized as false evidence. However, since the State has failed to challenge this assertion, it is deemed waived for purposes of analyzing the newly discovered evidence exception.

7. Because our resolution of this prong is dispositive, we need not reach arguments made by the State with respect to the fourth prong.

evidence must establish by a "clear and convincing standard that the petitioner is innocent of the offense ... for which the petitioner was convicted." Minn.Stat. § 590.01, subd. 4(b)(2). "Clear and convincing" means exactly what is suggested by the ordinary meaning of the terms making up the phrase. *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn. 1978). The burden of clear and convincing evidence is less than that required by the "beyond a reasonable doubt" standard in criminal matters and is met when the truth of the fact to be proven is "highly probable." *Id.; Rogers v. Moore*, 603 N.W.2d 650, 657 (Minn.1999). In order to prove a claim by clear and convincing evidence, a party's evidence should be unequivocal, intrinsically probable and credible, and free from frailties. *Kavanagh v. The Golden Rule*, 226 Minn. 510, 516–17, 33 N.W.2d 697, 700 (1948). Here, the evidence at issue does not establish Gassler's innocence under the clear and convincing standard.

■ While the NRC report and letter from the FBI establish that a portion of Agent Riley's testimony regarding CBLA evidence lacked scientific support and should not have been admitted, on the record here, the elimination of that evidence does not clearly and convincingly establish that Gassler is innocent. When last seen alive, Yungk was in Gassler's company. Gassler was seen sawing off the barrel of a shotgun the night before Yungk was murdered. Several witnesses testified that Gassler repeatedly referred to Yungk as a "snitch" before Yungk was killed and that after Yungk's murder Gassler stated to at least one person that he killed Yungk because Yungk was a "snitch" and had not given Gassler his share of money taken during burglaries. Yarbough testified that Gassler looked tired the morning after

Yungk was killed and told her that "Dale was dead," and that he and Scott had killed Yungk and left his body on the side of the road "to prove a point." Gassler was seen with a sawed off shotgun that smelled of gun powder the day after Yungk was killed, and a firearms examiner concluded that similarities exist between test wads [8] linked to Gassler and wads taken from the crime scene and Yungk's autopsy.

■ Gassler argues that without the CBLA evidence the State's case is composed of witnesses with questionable credibility and no physical evidence. This argument is unconvincing. Witness credibility is for the trier of fact to decide, not this court. Under Minn.Stat. § 590.01, subd. 4(b)(2), the burden of proving innocence is on the defendant, and merely showing that improperly admitted evidence may have influenced the jury does not by itself prove innocence. Because Gassler has failed to establish his innocence of Yungk's murder by the clear and convincing standard, we hold that the district court did not err when it concluded that Gassler is not entitled to have his petition considered under the newly discovered evidence exception to the statutory time bar.

## II.

■ Keeping in mind that at this stage we are only concerned with whether section 590.01, subdivision 4(b), permits consideration of the petition, and not with the petition's merits, we turn to Gassler's claims that he is entitled to relief under Minn.Stat. § 590.01, subd. 4(b)(5), the interests of justice exception. The postconviction court declined to consider the statute's interests of justice exception, concluding that because Gassler's claim is precluded by the newly discovered evi-

---

**8.** A "wad" is a part of a shotgun shell that provides a gas seal.

dence exception contained in section 590.01, subdivision 4(b)(2), the interests of justice exception cannot apply. In support of affirming the postconviction court's interests of justice determination, the State and the concurrence in this case argue that the postconviction court's reasoning is correct. We disagree.

When construing a statute, "words and phrases are construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a special meaning ... are construed according to such special meaning or their definition." Minn.Stat. § 645.08(1) (2008). Our goal

> is to ascertain and effectuate the intention of the legislature. Every law shall be construed, if possible, to give effect to all its provisions. When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit.

Minn.Stat. § 645.16 (2008). Here, Minn. Stat. § 590.01, subd. 4, is clear and free from all ambiguity.[9]

9. The concurrence claims to engage in a plain language interpretation of section 590.01; however, the concurrence then proceeds to rely on other rules "as illustrations." Based on these "illustrations," the concurrence concludes that "when a petition alleges that it falls within one of the four specific exceptions set forth in subdivision 4(b), the residual interests of justice exception cannot apply." However, the statutory text is the authoritative statement of legislative intent, not any other extrinsic material. *Goodman v. Best Buy, Inc.*, 777 N.W.2d 755, 758 (Minn.2010). "When the language of a statute is plain and unambiguous, it is assumed to manifest legislative intent and must be given effect." *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn.2001). When the language of a section is clear and free from all ambiguity, we cannot disregard the letter of the law under the pretext of pursuing the spirit. *See* Minn.Stat. § 645.16; *Beardsley v. Garcia*, 753 N.W.2d 735, 737 (Minn.2008). The concurrence's approach of utilizing civil rules to explain what it admits is a clear and unambiguous criminal statute is misguided. Either the words of the statute are clear and the statute's meaning can be interpreted by reliance on the statute's text, or the words create ambiguity and must be explained by reference to extrinsic material. Here, the concurrence has not and cannot point to any words in the statute that lend credence to its interpretation of section 590.01.

Moreover, Fed.R.Civ.P. 60(b) and Minn. R. Civ. P. 60.02 do not support the concurrence's position. Clause (6) of Federal Rule 60(b) states that the court may relieve a party from a final judgment for "any other reason that justifies relief." The United States Supreme Court has interpreted the words "any other" of Federal Rule 60(b) to impose a mutual exclusivity requirement. *Klapprott v. United States*, 335 U.S. 601, 613, 69 S.Ct. 384, 93 L.Ed. 266 (1949). Specifically, the Supreme Court held that a party may "not avail himself of the broad 'any other reason' clause of 60(b)" if his motion is based on grounds specified in other clauses. *Id; see also Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Minnesota Rule of Civil Procedure 60.02(f) is nearly identical to clause (6) of Federal Rule 60(b) and we have adopted the Supreme Court's analysis. *Chapman v. Special Sch. Dist. No. 1*, 454 N.W.2d 921, 924 (Minn.1990) (holding that relief is available under Minn. R. Civ. P. 60.02(f) only if the basis for the motion is other than that specified under clauses (a) through (e)).

If our legislature had intended a mutual exclusivity requirement, it could have expressly stated such an intent or included the words "any other." However, it did not. Therefore, we cannot abandon the plain meaning of the words in the statute in order to facilitate what the concurrence views as the legislature's intent. Finally, the rule the concurrence relies on as "illustration" is a civil rule. This is a criminal case with different considerations. Even if we were to ignore the clear and unambiguous language of the statute and consider the concurrence's procedure for interpreting the statute, we would still be compelled to conclude that the interests of justice exception may be considered as ambiguity,

An otherwise untimely petition for post-conviction relief may be heard by a court if an exception set out in section 590.01, subdivision 4(b), applies. Subdivision 4(b) provides:

(b) Notwithstanding paragraph (a), a court may hear a petition for postconviction relief if:

. . .

(2) the petitioner alleges the existence of newly discovered evidence, including scientific evidence, that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted;

. . .; or

(5) the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice.

■ Generally, unless the context of the statutory provision requires otherwise, we have read the legislature's use of the word "or" when connecting a series of clauses in a statute to be disjunctive. *See, e.g., Amaral v. St. Cloud Hosp.*, 598 N.W.2d 379, 385 (Minn.1999) ("Absent context revealing that the word 'or' should be read as a conjunctive, we have generally read 'or' to be disjunctive."); *Aberle v. Faribault Fire Dep't Relief Ass'n*, 230 Minn. 353, 360, 41 N.W.2d 813, 817 (1950) ("The word 'or' is a disjunctive and ordinarily refers to different things as alternatives."); *see also* Merriam–Webster's Collegiate Dictionary 872 (11th ed.2004) (defining "or" as "a function word to indicate an alternative"). Here, the legislature used the disjunctive word "or" to connect the five exceptions to the postconviction statute's time bar. When the provisions of section 590.01, subdivision 4, are read in context, we conclude that there is nothing to suggest that the use of the word "or" was intended to be anything other than disjunctive. As noted above, when the words of a statute are clear, we may not disregard the letter of the law under the pretext of pursuing the law's spirit. Minn.Stat. § 645.16; *see also Jones v. Borchardt*, 775 N.W.2d 646, 648 (Minn.2009) (noting that this· court may not disregard the plain language of a statute to search for an alternative legislative intent). Therefore, we read section 590.01, subdivision 4(b), to provide that if a petitioner can satisfy any of the five exceptions to the time bar, the time bar does not apply.

Because the postconviction court determined that it was not required to consider subdivision 4(b)'s interests of justice exception, we conclude that the postconviction court erred.[10]

### III.

We next consider whether section 590.01, subdivision 4(b)(5), permits Gassler's petition to be heard. In order to be heard, Gassler must establish that his peti-

and concerning the ambit of criminal statutes must be resolved in favor of lenity. *See State v. Niska*, 514 N.W.2d 260, 265 (Minn.1994).

**10.** In responding to Gassler's motion for reconsideration, the postconviction court stated that it implicitly considered whether the inter-ests of justice exception should apply in its analysis of the newly discovered evidence exception. As discussed in more detail below, the interests of justice exception requires consideration of factors that are not a part of the postconviction court's analysis of the newly discovered evidence exception.

tion is not frivolous and is in the interests of justice.

A petition is frivolous if it is perfectly apparent, without argument, that the petition is without merit. *See Johnson v. St. Paul City Ry. Co.*, 68 Minn. 408, 409, 71 N.W. 619, 619 (1897); *Bronzin Holding Co. v. McGee*, 166 Minn. 129, 130, 207 N.W. 199, 200 (1926) (holding that an answer is frivolous when insufficiency appears on mere inspection); *Black's Law Dictionary* 692 (8th ed.1999) (defining "frivolous" as "[l]acking a legal basis or legal merit; not serious; not reasonably purposeful"). Here, the postconviction court held that Gassler's petition is not frivolous, and the State does not challenge that conclusion. Having established that Agent Riley's CBLA testimony lacked scientific support, Gassler's petition challenging his conviction based in part on that testimony on its face has substantive merit. Therefore, we conclude that Gassler has established that his petition is not frivolous.

We have not, in the past, analyzed what must be shown to obtain relief in the interests of justice under section 590.01, subdivision 4(b)(5); nor does subdivision 4 provide any direction. The only time that the subdivision 4(b)(5) interests of justice exception has been before us, we declined to apply the exception without any discussion of what must be shown to obtain relief in the interests of justice. *Moua v. State*, 778 N.W.2d 286, 289 (Minn.2010) ("But Moua does not explain, and we fail to see, how the interests of justice favor the hearing of his petition."). However, in other contexts, we have identified what must be shown to obtain relief in the interests of justice.[11]

First, we note that we have only applied the interests of justice in exceptional situations. *See In re Welfare of S.M.E.*, 725 N.W.2d 740, 744 (Minn.2007) (discussing the application of the interests of justice in exceptional cases to allow out-of-time appeals to proceed); *see also Powell v. Anderson*, 660 N.W.2d 107, 121 (Minn. 2003) ("We must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice.") (quoting *Liljeberg*, 486 U.S. at 864, 108 S.Ct. 2194); *In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 6–7 (Minn.2003) (Anderson, Paul H., J., concurring in part, dissenting in part) ("We must be wary of a broom that sweeps too broadly and rules that are so strictly enforced that justice has the very real potential of being denied. This court must retain the flexibility granted to it under our constitution to do what is right despite statutory proscriptions or presumptions.... A strict interpretation of the rules requires dismissal, but the interests of justice require that we reach the merits of this case."); *Valencia v. Markham Coop. Ass'n*, 210 Minn. 221, 226, 297 N.W. 736, 738–39 (1941) (noting that new trials are granted in the interests of justice only in exceptional cases).

Beyond establishing that we will only apply the interests of justice exception in exceptional situations, we have identified a non-exclusive list of factors to be considered. In *Deegan v. State*, we discussed the interests of justice exception to the *Knaffla* rule. 711 N.W.2d 89, 93–94 (Minn.2006). We explained that to satisfy that exception, a claim must have substantive merit and the defendant must not have deliberately and inexcusably failed to raise the issue on direct appeal. *Deegan,*

---

11. We have previously explained that when the legislature uses a phrase we assume the legislature is aware of the common law understanding of the phrase and that the legislature intended to use the phrase according to its commonly understood meaning. *See In re Welfare of D.D.S.*, 396 N.W.2d 831, 832 (Minn.1986).

711 N.W.2d at 93–94. In *State v. Green*, 747 N.W.2d 912, 918 (Minn.2008), we noted that in deciding whether to grant relief in the interests of justice, courts should weigh the degree to which the party alleging error is at fault for that error, the degree of fault assigned to the party defending the alleged error, and whether some fundamental unfairness to the defendant needs to be addressed. We have also acted in the interests of justice when necessary to protect the integrity of judicial proceedings. *State v. Kaiser*, 486 N.W.2d 384, 385–86 (Minn.1992) (holding that in exercise of our supervisory powers over trial courts and in the interests of justice, we may, in order to protect evidentiary rules from erosion, award a new trial for the prosecution's breach of discovery rules even though required showing of prejudice has not been made). We have recognized, however, that under certain circumstances the *reversal* of a conviction may seriously affect the fairness, integrity, or public reputation of judicial proceedings. *State v. Griller*, 583 N.W.2d 736, 742 (Minn.1998) (declining to reverse the defendant's conviction despite the undisputed plain error in the jury instructions).

■ Applying these factors to Gassler's claims, we conclude that this case does not fall into the category of exceptional cases requiring that we set aside Minn.Stat. § 590.01, subd. 4(a)'s, time bar in the interests of justice. There is no dispute that at trial the State offered and the district court admitted scientific evidence directly linking Gassler to Yungk's murder, which was later determined to have no scientific value. Further, there is no dispute that Gassler has not had an opportunity to have the effect of this improperly admitted evidence on his conviction evaluated. Additionally, we conclude that the delay in filing Gassler's postconviction petition can only be attributed to the FBI's failure to make clear before January 2009 that Agent Riley's CBLA testimony was not supported by science.[12] These facts notwithstanding, we conclude that the interests of justice do not require that Gassler's petition be heard in spite of the statutory time bar. While admission of Agent Riley's CBLA testimony is problematic, as discussed above and in our opinions affirming his conviction on direct appeal and affirming the denial of his first petition for postconviction relief, there was substantial admissible evidence of Gassler's guilt admitted at trial, including evidence that Gassler admitted to others that he had killed Yungk. That evidence linked Gassler to Yungk's murder circumstantially and through his admissions to others directly. Given this evidence, we cannot say that the admission of Agent Riley's testimony resulted in a trial so fundamentally unfair to Gassler as to require us to act to protect the integrity of the judicial process. Indeed, as was the case in *Griller*, "we conclude that it would be a miscarriage of justice" to consider Gassler's petition in the interests of justice under Minn. Stat. § 590.01, subd. 4(b)(5).[13] *See* 583 N.W.2d at 742.

Affirmed.

---

12. The State argues that the FBI's 2005 report, which stated, "the FBI Laboratory still firmly supports the scientific foundation of bullet lead analysis" should be the date on which appellant's claim arose, not the 2007 press release in which the FBI stated that the primary factor that lead the FBI to stop CBLA testing is the "inability of scientists and manufacturers to definitively evaluate the significance of an association between [indistinguishable bullets]." Such a claim is wholly without merit as the State is suggesting that Gassler should have determined that CBLA testing was flawed two years before the only laboratory that performed CBLA testing was willing to concede that there was a flaw.

13. Because we hold that Gassler's claims are barred by Minn.Stat. § 590.01, subd. 4(a), we

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Chief Justice (concurring).

I agree with the majority that Gassler's petition for postconviction relief is time barred under Minn.Stat. § 590.01, subd. 4 (2008). And I join Part I of the majority opinion, in which the majority concludes that Gassler is not entitled to have his petition for postconviction relief considered under the newly discovered evidence exception to the statutory time bar. But I disagree with the majority insofar as it concludes that the postconviction court should have also considered whether Gassler's petition met the interests of justice exception in section 590.01, subdivision 4. In my view, when a petition alleges that it falls within one of the four specific exceptions set forth in subdivision 4(b), the residual interests of justice exception cannot apply.

Minnesota Statutes § 590.01, subdivision 4(a), requires that any petition for postconviction relief be filed no more than 2 years after the date of "the entry of judgment of conviction or sentence if no direct appeal is filed" or "an appellate court's disposition of petitioner's direct appeal." Subdivision 4(b) of that section creates five exceptions to this 2–year statute of limitations. The two provisions of subdivision 4(b) that are relevant to this case are as follows:

(2) the petitioner alleges the existence of newly discovered evidence, including scientific evidence, that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted;

...; or

(5) the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice.

Minn.Stat. § 590.01, subd. 4(b). The statute goes on to provide in subdivision 4(c) that "[a]ny petition invoking an exception provided in paragraph (b) must be filed within two years of the date the claim arises." *Id.*, subd. 4(c).

There is no dispute that Gassler's petition was untimely unless he satisfies one of the subdivision 4(b) exceptions. Gassler argues that his petition satisfies two of the exceptions—the newly discovered evidence exception and the interests of justice exception. I agree with the majority that Gassler does not satisfy the newly discovered evidence exception. But, because the basis for Gassler's petition falls squarely within the parameters of the newly discovered evidence exception, he cannot avoid the strict requirements of that exception by merely arguing that his is an interests of justice petition.

The legislature has carefully detailed the requirements a petitioner must meet to receive a new trial based on newly discovered evidence in subdivision 4(b)(2). As the majority acknowledges, to satisfy this exception the petitioner must: (1) allege the existence of newly discovered evidence, including scientific evidence; (2) show that the evidence could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the 2–year time period for filing a postconviction petition; (3) show

decline to consider the other claims raised by Gassler.

that the evidence is not cumulative to evidence presented at trial; (4) show that the evidence is not for impeachment purposes; and (5) show that the evidence establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted. Minn.Stat. § 590.01, subd. 4(b)(2). The majority properly concludes that Gassler has not established by "clear and convincing evidence" that he was innocent of the offense for which he was convicted and finds his failure to meet this prong dispositive.

But the majority then thwarts the legislature's very specific and detailed instructions about the circumstances in which a new trial should be granted when it allows Gassler a second chance to make out his case for a new trial under the more generic interests of justice exception. I would treat the interests of justice exception as a residual exception, intended to cover situations not covered by the other four exceptions of subdivision 4(b), not as a means by which petitioners may circumvent the more specific requirements of the other statutory exceptions.

While we have not had the opportunity to construe the interaction between the exceptions in section 590.01, subdivision 4, our precedent construing an analogous provision—Minn. R. Civ. P. 60.02—confirms my analysis. Rule 60.02 provides that a court "may relieve a party or the party's legal representatives from a final judgment (other than a marriage dissolution decree), order, or proceeding" for the following reasons:

(a) Mistake, inadvertence, surprise, or excusable neglect;

(b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial pursuant to Rule 59.03;

(c) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(d) The judgment is void;

(e) The judgment has been satisfied, released, or discharged or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(f) Any other reason justifying relief from the operation of the judgment.

Minn. R. Civ. P. 60.02. The rule further provides two different limitations periods depending on which statutory provision is invoked. It provides that such a motion "shall be made within a reasonable time, and for reasons (a), (b), and (c) not more than 1 year after the judgment, order, or proceeding was entered or taken." *Id.*

Our case law interpreting Rule 60.02 makes clear that a party moving to set aside a judgment based on newly discovered evidence may not avoid the 1–year statute of limitations that applies to the newly discovered evidence exception under (b) by invoking the catch-all provision under (f). *See Anderson v. Anderson,* 288 Minn. 514, 518, 179 N.W.2d 718, 722 (1970) ("Rule 60.02(6) is a residual clause to cover any unforeseen contingency and it is exclusive of clauses (1) through (5)."). Instead, we have held that a party seeking relief must base their motion under the specific exception that applies. *See Chapman v. Special Sch. Dist. No. 1,* 454 N.W.2d 921, 924 (Minn.1990) ("Clause (f) has been designated as a residual clause, designed only to afford relief in those circumstances exclusive of the specific areas addressed by clauses (a) through (e)."); *Sommers v. Thomas,* 251 Minn. 461, 466–67, 88 N.W.2d

191, 195 (1958) ("Clause (6) [1] is couched in very broad terms. It gives to the court the power to relieve a party of a final judgment in the exercise of its sound discretion, subject only to two limitations: (1) the motion for relief must be made within a reasonable time and (2) relief may not be had under clause (6) when the grounds for granting it fall properly under clauses (1), (2), or (3), to which the one-year limitation applies."). Only in situations not covered by one of the other five exceptions do we consider whether relief might be justified under the catch-all provision of clause (f). See *Chapman*, 454 N.W.2d at 924.

Our Rule 60.02 in turn closely parallels Rule 60(b) of the Federal Rules of Civil Procedure.[2] Similar to our Rule 60.02, the catch-all exception found in Rule 60(b)(6) provides that a court may relieve a party from a final judgment for "any other reason that justifies relief." The federal courts interpret this catch-all provision as applying only when the motion "is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 & n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *see also Cotto v. United States*, 993 F.2d 274,

278 (1st Cir.1993) ("[P]laintiffs' attempt to garb their motion in the raiment of clause (6) runs aground on the bedrock principle that clause (6) may not be used as a vehicle for circumventing clauses (1) through (5)."); *Matter of Dakota Cheese*, 923 F.2d 576, 577 (8th Cir.1991) (explaining that, because motion was based on newly discovered evidence, it was governed by the 1-year limitation period of Rule 60(b)(2) and concluding the parties could not characterize it as arising under Rule 60(b)(6) to avoid the limitation period). As explained in Moore's *Federal Practice*, "[i]f the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." 12 James Moore, *Federal Practice* § 60.48[2] (3d ed.2010).

In my view, the exceptions to the time bar in the postconviction statute, Minn. Stat. § 590.01, subd. 4, operate in the same way as the exceptions to the time bar in our Rule 60.02 and to Fed.R.Civ.P. 60(b). I would adhere to the cases interpreting these similar rules and construe the exceptions in Minn.Stat. § 590.01, subd. 4, as mutually exclusive.[3]

1. The numbering of the provisions is from the earlier version of Rule 60.02. Minn. R. Civ. P. 60.02 (1988) (amended Dec. 20, 1993).

2. We have looked to the interpretation of Rule 60(b) in the past in interpreting our own Rule 60.02. *See Newman v. Fjelstad*, 271 Minn. 514, 521–22, 137 N.W.2d 181, 186 (1965); *Sommers*, 251 Minn. at 467 n. 10, 88 N.W.2d at 195 n. 10. Moreover, because habeas proceedings are treated as civil matters, Rule 60(b) has been applied in the habeas context. *See* 12 James Moore, *Federal Practice* § 60.02[2] (3d ed.2010) (discussing application of Rule 60(b) to habeas proceedings and noting that its application in this context may be modified by the special requirements of the Antiterrorism and Effective Death Penalty Act of 1996). We have recognized in the past that our postconviction proceedings are similar in

some respects to habeas proceedings. *See Townsend v. State*, 646 N.W.2d 218, 222 (Minn.2002) (discussing the similarities between a habeas petition and a petition for postconviction relief and holding that the district court did not err in construing a petition for a writ of habeas corpus as a petition for postconviction relief). The interpretation of Rule 60(b) therefore is helpful to the issue presented in this postconviction case.

3. The majority suggests that I find Minn.Stat. § 590.01 ambiguous and that I improperly rely on Minn. R. Civ. P. 60.02 to resolve this ambiguity. The majority is mistaken. I do not find the statute to be ambiguous. On the contrary, I believe the statute is plain on its face. I look to Minn. R. Civ. P. 60.02 and Fed.R.Civ.P. 60(b) not to resolve an ambiguity, but rather I use them as illustrations of

The majority reaches the opposite conclusion, arguing that because the legislature used "or" in the statute, the exceptions must be read disjunctively. But the cases the majority cites to reach its conclusion do not involve similar statutory provisions. *See Amaral v. St. Cloud Hosp.,* 598 N.W.2d 379, 385–88 (Minn.1999) (analyzing whether the word "or" should be read disjunctively or conjunctively in the context of a statute addressing "professionals requesting or seeking" certain privileged information and concluding that it should be read conjunctively in the context of the statute in question); *Aberle v. Faribault Fire Dep't Relief Ass'n,* 230 Minn. 353, 359–60, 41 N.W.2d 813, 817 (1950) (interpreting the "or" disjunctively in a statute addressing pensions and benefits paid "under or in accordance with any prior act or acts") (internal quotation marks omitted). These cases therefore shed no light on the question presented here.

Moreover, the dispute is not over whether "or" is read as disjunctive or conjunctive in Minn.Stat. § 590.01, subd. 4, as the majority suggests. Rather, the dispute is over whether Gassler may avoid the stringent requirements of the newly discovered evidence exception of subdivision 4(b)(2) by arguing that his newly discovered evidence gives him the right to petition for a new trial "in the interests of justice" under subdivision 4(b)(5).

Unlike the majority, I read the five exceptions to the 2–year statute of limitations to each address a distinct factual situation in which the postconviction court is instructed to hear a petition for postconviction relief despite the fact it was not brought within the statutory time frame.

The first four exceptions are each narrowly tailored to a particular factual scenario. The final exception is designed to cover any other factual situation that might come up that would demand relief but is not already covered by one of the other four exceptions. As the majority acknowledges, relief will be merited under subdivision 4(b)(5) only in exceptional cases. *See supra* at 585; *cf. Valencia v. Markham Coop. Ass'n,* 210 Minn. 221, 226, 297 N.W. 736, 738–39 (1941) (explaining that a new trial will be granted in "the interests of justice" only in "exceptional cases"). Petitioners should not be permitted to circumvent the specific requirements of one of the other four exceptions by making out a case under the fifth, general exception. *Cf. Wesco Prods. Co. v. Alloy Auto. Co.,* 880 F.2d 981, 983 (7th Cir.1989) ("Inherent in the structure of Rule 60(b) is the principle that the first three clauses and the catchall clause are mutually exclusive. . . . The rationale underlying this principle is that the one year time limit applicable to the first three clauses of Rule 60(b) would be meaningless if relief was also available under the catchall provision."). We must give effect to all of the provisions in the statute. *See* Minn.Stat. § 645.17(2) (2008) (noting that "the legislature intends the entire statute to be effective"). We can only do this if the interests of justice exception means something different than what is already covered by the other exceptions in the statute. Because Gassler's petition sets forth a claim of newly discovered evidence, the exception in subdivision 4(b)(2), I would hold that he was not entitled to review under the interests of justice exception in subdivision 4(b)(5).

---

similar rules that courts (ours and the federal courts) have interpreted in a similar manner based on their plain meaning. *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2864 (2d ed.1995) (explaining that the case law

"establish[es] that clause (6) and the first five clauses are mutually exclusive and that relief cannot be had under clause (6) if it would have been available under the earlier clauses" and concluding that "[t]his reading seems required also by the language of the rule.").

DIETZEN, Justice (concurring).

I join in the concurrence of Chief Justice Gildea.